UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH ALLEN MCCOLLOUGH III,<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br><br>　　　　　　　　　Defendant. | Case No.: 16-CV-1166-JLS(WVG)<br><br>**REPORT AND RECOMMENDATION RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>**[ECF Nos. 15 & 17.]** |

This is an action for judicial review of a decision by the Acting Commissioner of Social Security, Carolyn W. Colvin ("the Commissioner," or "Defendant"), denying Plaintiff Joseph Allen McCollough III ("Plaintiff") disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act") and supplemental security income ("SSI") benefits under Title XVI of the Act. The parties have filed cross-motions for summary judgment, and the matter is before the undersigned Magistrate Judge for preparation of a Report and Recommendation. *See* 28 U.S.C. § 636; S.D. Cal. Civ. L. R. 72.1(c). For the reasons stated below, the Court RECOMMENDS that Plaintiff's motion for summary judgment be DENIED,

1

Defendant's cross-motion for summary judgment be GRANTED, and judgment be entered accordingly.

## I. SOCIAL SECURITY CLAIM PROCEEDINGS

Pursuant to the Act, the Social Security Administration ("SSA") administers the DIB and the SSI programs. 42 U.S.C. § 901. The Act authorizes the SSA to create a system by which it determines who is entitled to benefits and by which unsuccessful claimants may obtain review of adverse determinations. *Id.* §§ 423 *et seq.* Defendant, as Acting Commissioner of the SSA, is responsible for the Act's administration. *Id.* § 902(a)(4), (b)(4).

### A. SSA's Sequential Five-Step Process

The SSA employs a sequential five-step evaluation to determine whether a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520. To qualify for disability benefits under the Act, a claimant must establish (1) he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment," 42 U.S.C. § 423(d)(1)(A); (2) his or her impairment persisted at least longer than a twelve month period, *id.*; *see also* 20 C.F.R. § 404.1509; and (3) he or she "either was permanently disabled or subject to a condition which became so severe as to create a disability prior to the date upon which [his or] her disability insured status expired," *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995); *see also* 42 U.S.C. § 423(a)(1)(A).

An administrative law judge ("ALJ") presides over the five-step process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the Commissioner finds that a claimant is disabled or not disabled at any step in this process, the review process is terminated at that step. *Corrao v. Shalala*, 20 F.3d 943, 946 (9th Cir. 1994).

2

Step one in the sequential evaluation considers a claimant's "work activity, if any." 20 C.F.R. § 404.1520(a)(4)(i). An ALJ will deny a claimant disability benefits if the claimant is engaged in "substantial gainful activity." *Id.* §§ 404.1520(b), 416.920(b).

If a claimant cannot provide proof of gainful work activity, the ALJ proceeds to step two to ascertain whether the claimant has a medically severe impairment or combination of impairments. The so-called "severity regulation" dictates the course of this analysis. *Id.* §§ 404.1520(c), 416.920(c); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

An ALJ will deny a claimant's disability claim if the ALJ does not find that a claimant suffers from a severe impairment, or combination of impairments, which significantly limits the claimant's physical or mental ability to do "basic work activities." *Id.* § 404.1520(c). The ability to do "basic work activities" means "the abilities and aptitudes necessary to do most jobs." *Id.* §§ 404.1521(b), 416.921(b).

However, if the impairment is severe, the evaluation proceeds to step three. At step three, the ALJ determines whether the impairment is equivalent to one of several listed impairments that the SSA acknowledges are so severe as to preclude substantial gainful activity. *Id.* §§ 404.1520(d), 416.920(d). An ALJ conclusively presumes a claimant is disabled so long as the impairment meets or equals one of the listed impairments. *Id.* §§ 404.1520(d).

If the ALJ has not yet deemed a claimant disabled, but before formally proceeding to step four, the ALJ must establish the claimant's Residual Functional Capacity ("RFC"). *Id.* §§ 404.1520(e), 404.1545(a). An individual's RFC is his or her ability to do physical and mental work activities on a sustained basis despite limitations from his or her impairments. *Id.* §§ 404.945(a)(1), 404.1545(a)(1). The RFC analysis considers "whether [the claimant's] impairment(s), and any related

3

symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." *Id.* §§ 404.1545(a)(1), 416.945(a)(1). In establishing a claimant's RFC, the ALJ must assess relevant medical and other evidence, as well as consider all of the claimant's impairments, including impairments categorized as non-severe. *Id.* § 404.1545(a)(3), (e).

At step four, the ALJ uses the claimant's RFC to determine whether the claimant has the RFC to perform the requirements of their past relevant work. 20 *Id.* § 404.1520(f). So long as a claimant has the RFC to carry out his or her past relevant work, the claimant is not disabled. *Id.* §§ 404.1560(b)(3). Conversely, if the claimant either cannot or does not have any past relevant work, the analysis presses onward.

At the fifth and final step of the SSA's evaluation, the ALJ must verify whether the claimant is able to do *any* other work in light of his or her RFC, age, education, and work experience. *Id.* § 404.1520(g). If the claimant is able to do other work, the claimant is not disabled. However, if the claimant is not able to do other work and meets the duration requirement, the claimant is disabled. *Id.* Although the claimant generally continues to have the burden of proving disability at step five, a limited burden of going forward with the evidence shifts to the SSA. At this stage, the SSA must present evidence demonstrating that other work that the claimant can perform—allowing for his RFC, age, education, and work experience—exists in significant numbers in the national economy. *Id.* §§ 404.1520, 1560(c), 416.920, 404.1512(f).

**B.    SSA Hearings and Appeals Process**

A network of SSA field offices and state disability determination services initially process applications for disability benefits. The processing begins when a claimant completes both an application and an adult disability report, and submits

those documents to one of the SSA's field offices. If the SSA denies the claim, the claimant is entitled to a hearing before an ALJ in the SSA's Office of Disability Adjudication and Review. *Id.* §§ 404.929, 416.1429. A hearing before an ALJ is informal and non-adversarial. *Id.* § 404.900(b).

In accordance with Defendant's delegation, the Office of Disability Adjudication and Review administers a nationwide hearings and appeals program. SSA regulations provide for a four-step process for administrative review of a claimant's application for disability payments. *See* 20 C.F.R. §§ 416.1400, 404.900. Once the SSA makes an initial determination, three more levels of appeal exist: (1) reconsideration, (2) hearing by an ALJ, and (3) review by the Appeals Council. *See id.* §§ 416.1400, 404.900. If the claimant receives an unfavorable decision by an ALJ, the claimant may request review by the Appeals Council. 20 C.F.R. §§ 404.967, 416.1467. The Appeals Council will grant, deny, dismiss, or remand a claimant's request. *Id.* §§ 416.1479, 404.979. If the claimant is not satisfied with the decision at any step of the process, the claimant has sixty days to seek administrative review. *See id.* §§ 404.933, 416.1433. If the claimant does not request review, the decision becomes the SSA's—and hence Defendant's—binding and final decree. *See id.* §§ 404.905, 416.1405.

If a claimant disagrees with the Appeals Council's decision or the Appeals Council declines to review the claim, the claimant may seek judicial review in a federal district court pursuant to 42 U.S.C. § 405(g) or § 1383(c). *See* 20 C.F.R. §§ 404.981, 416.1481. If a district court remands the claim, the claim is sent to the Appeals Council, which may either make a decision or refer the matter to another ALJ. *Id.* § 404.983.

## II.    BACKGROUND

### A.    Administrative Proceedings

On August 15, 2012, Plaintiff protectively filed an application for DIB and SSI, alleging disability as of June 15, 2012.  (AR 25, 85, 86.)  On December 18, 2012, the SSA denied Plaintiff's initial application.  (AR 25, 74, 83.)  On August 2, 2013, Plaintiff was again denied benefits upon reconsideration.  (AR 25, 97, 108.)

On August 21, 2014, the ALJ held a hearing to review Plaintiff's case in San Diego, California.  (AR 25.)  Plaintiff, medical expert John R. Morse, M.D., and vocational expert Behnush Barzegarian testified at the hearing.  (*Id.*)

The ALJ issued his written decision on November 4, 2014.  (AR 25-32.)  At step one of the sequential evaluation process described above, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of June 15, 2012.  (AR 27.)

At step two, the ALJ found that Plaintiff had the following severe impairments: ulcerative colitis, irritable bowel syndrome (IBS), gastroesophageal reflux disease (GERD), diabetes mellitus, degenerative disc disease, and obesity.  (AR 27-28.)

At step three, the ALJ concluded that Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR 28.)

Between steps three and four, in his RFC determination, the ALJ found that Plaintiff could perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with the exceptions that "the claimant is able to occasionally climb ramps and stairs but may never climb ladders, ropes and scaffolds; is able to occasionally balance, stoop, kneel, crouch, and crawl; and must avoid even moderate exposure to hazardous machinery and unprotected heights."  (AR 28-31.)

At step four, the ALJ found that Plaintiff was capable of performing past relevant work as a "sorter pricer." (AR 31-32.) This determination in step four meant that Plaintiff was not disabled and was the reason the ALJ terminated his evaluation. (AR 31-32.) Accordingly, the ALJ found that Plaintiff was not disabled from June 15, 2012, his alleged onset of disability date, through the date of the decision. (AR 32.)

On January 5, 2015, Plaintiff requested a review of the ALJ's decision. (AR 19-21.) On April 11, 2016, the Appeals Council denied review. (AR 1-6.) The ALJ's decision thereupon became the SSA's final and definitive determination in Plaintiff's case. 42 U.S.C. § 405(g).

On May 16, 2016, Plaintiff commenced the instant action for judicial review. (ECF No. 1.) On November 28, 2016, Plaintiff filed a Motion for Summary Judgment ("MSJ"). (ECF No. 15.) On December 15, 2016, Defendant filed a Cross-Motion for Summary Judgment ("Cross-MSJ") and opposition to Plaintiff's MSJ. (ECF No. 17.) On January 14, 2017, Plaintiff filed a reply to Defendant's Cross-MSJ. (ECF No. 18.)

**B.    Summary of Relevant Medical Records Submitted to the ALJ for Review**

The medical documentation in the record dates back to 2003 and focuses mostly on Plaintiff's ulcerative colitis and degenerative lumbar disc disease. Plaintiff's ulcerative colitis caused periodic flare-ups two to four times per year, during which Plaintiff experienced increased diarrhea, abdominal pain, and blood in the stool. (AR 544.) Plaintiff also suffered from sleep apnea, IBS, type 2 diabetes, GERD, and hypogonadism for which he received periodic testosterone shots. (AR 286-456 *Passim*.)

Between 2005 and February 2012, Plaintiff visited gastroenterologists Dr. Paul Craig and Dr. Nawang Sherpa twenty-four times in Spokane Valley,

Washington, to treat his ulcerative colitis. (AR 292-331.) During this time period, Plaintiff experienced periodic flare-ups of his ulcerative colitis and received regular colonoscopies but nonetheless continued to work for Goodwill as a laborer. (*Id.*) The ulcerative colitis was controlled with a regimen of sulfaslazine and folate along with rowasa enemas as needed. (AR 299, 301, 303, 305, 308-309, 318.). His treatment plan also included diet and exercise to manage his mild obesity. (AR 297, 303, 305, 311.) On August 15, 2011, Plaintiff underwent an epidural steroid injection to treat persistent pain in his lower back. (AR 287-288.) On February 20, 2012, Plaintiff's ulcerative colitis and IBS symptoms became aggravated from stress caused by his mother's death. (AR 295.)

On August 22, 2012, Plaintiff visited Palomar Medical Center's emergency room in Escondido, California, complaining of abdominal pain and rectal bleeding caused by a flare-up of his ulcerative colitis. (AR 335.) An examination also revealed lower extremity edema, and CT scans showed degenerative changes to his spine. (AR 336, 345.) Prior to this time, Plaintiff had not seen a doctor since his February 28, 2012 visit with Dr. Craig. (AR 335.) During this gap, Plaintiff had left his job at Goodwill and moved to California to live with his sister. (*Id.*) He remained unemployed. (*Id.*)

In the ensuing four months, Plaintiff visited Neighborhood Healthcare six times to get treatment for his ulcerative colitis, as well as testosterone shots for his hypogonadism. (AR 357-378.) During these visits, his diarrhea and bloody stool symptoms became less prominent. (*Id.*)

From January to June 2013, Plaintiff visited Neighborhood Healthcare thirteen times for ulcerative colitis checkups, lab work, and testosterone injections. (AR 411-438.) The record shows general improvements in his diarrhea—down to eight bowel movements a day—but, on June 12, 2013, Plaintiff experienced a flare-

16-CV-1166-JLS(WVG)

up of his ulcerative colitis. (AR 413, 425.) Plaintiff's back pain continued to increase during this period. On February 18, 2013, his pain medication was doubled after he complained that the pain had spread to his leg. (AR 430.) On February 27, 2013, radiology reports showed mild degenerative disc disease but no acute abnormalities. (AR 451.) And on May 1, 2013, plaintiff received several epidurals to manage his back pain and began physical therapy for his back. (AR 419.) At this point, plaintiff required a cane to walk. (AR 420.)

The final period of medical documentation in the record spans from July 2013 through June 2014. During this one-year period, Plaintiff visited Neighborhood Healthcare nineteen times, visited a gastroenterologist at UC San Diego Health Care four times, and participated in physical therapy at Palomar Pain Management Center. (AR 460-564.) During this period, Plaintiff experienced three flare-ups of his ulcerative colitis, but, on November 11, 2013, he began a steroid treatment that reduced his bowel movements to between one and four per day, though he did experience one flare-up in March 2014. (AR 474, 478, 544, 548.) The June 16, 2014 visit to Neighborhood Healthcare shows his ulcerative colitis was in remission. (AR 460.)

Plaintiff continued to report increased back pain from 2013 to 2014. (AR 460-564.) Plaintiff had trouble getting up from seated positions and fell multiple times during medical checkups. (AR 460, 467, 497, 518, 525.) The July 12, 2013 medical report indicates that he was instructed "not to sit for long periods of time" and to "move legs a few times" before getting up. (AR 525.) On November 14, 2013, Plaintiff began taking Norco to manage his back pain, which had spread from his back to his toes. (AR 497.) The dosage was increased to 15 milligrams, four times per day, starting on June 16, 2014. (AR 466.) As of January 2014, the medical reports indicated that the physical therapy did not have much success in

9

alleviating Plaintiff's pain. But by July 2014, the reports showed that Plaintiff had experienced "moderate improvements." (AR 485, 536.) Additionally, in March 2014, Plaintiff was diagnosed as morbidly obese and told that he must diet to facilitate weight loss. (AR 476, 537.)

The record shows that Plaintiff has suffered edema of his extremities periodically over the past twelve years, but it does not seem to be a persisting ailment. (AR 336, 414, 546, 549, 563.) As recently as March 12, 2014, he did not appear to have any edema of his extremities but was told to check his feet daily for swelling. (AR 475-476.) However, Plaintiff's visit to Center City Podiatry Group on April 22, 2014, does reference pitting ankle edema. (AR 563.) During that visit, Plaintiff was fitted for diabetic extra depth shoes to address the swelling. (*Id*.)

## C.    Plaintiff's Testimony

Plaintiff testified at the hearing before the ALJ on November 4, 2014. (AR 40-56.) As is relevant here, Plaintiff told the ALJ that he experienced pain that extended from his entire back down to his feet. (AR 45.) The pain prevented him from walking more than a block, sitting more than a half hour without stretching, standing more than ten minutes at a time, or lifting more than a gallon of water. (AR 46, 51.) Plaintiff stated that he must use a cane to walk but could still drive. (AR 43, 44.) The pain was managed by medication and physical therapy, which Plaintiff testified did not help. (AR 44.)

The ulcerative colitis symptoms Plaintiff experienced included cramping pain, diarrhea, and rectal bleeding. (AR 42, 47.) Plaintiff claimed that during bad days he used the bathroom between ten and one hundred times per hour, and on good days, every twenty to thirty minutes. (AR 47-48.) However, Plaintiff confirmed that the ulcerative colitis was in remission but indicated that his IBS was worse than it was two years before the hearing and claimed that he had been unable

to start new treatment to keep the ulcerative colitis in remission because of insurance issues. (AR 43, 49, 54.)

Regarding Plaintiff's ability to function daily, he testified that he had difficulties showering and getting dressed. (AR 51-52.) Plaintiff also testified that while he left his job at Goodwill because he had relocated, he would have had to stop working because of his increasing back pain. (AR 40-41.) He further stated that when he tried to find work at a different Goodwill, he was told that despite his experience, he "could never do the work." (AR 52.)

**D.    The Medical Expert's Testimony**

Dr. John R. Morse testified as the medical expert at Plaintiff's hearing after listening to his testimony. (AR 57-62.) Prior to the hearing, Dr. Morse had evaluated Plaintiff's medical records, Exhibits F1-F9,[1] and attempted to identify any disabling medical conditions based on his reported issues and the medical documentation. (*See* AR 57.) In doing so, Dr. Morse determined that Plaintiff's ulcerative colitis, diabetes,[2] and degenerative disc disease constituted severe medical impairments. (AR 58-59.) Otherwise, Dr. Morse opined that Plaintiff's IBS and hypogonadism presented only non-severe impairments. (AR 58.)

Dr. Morse first considered Plaintiff's ulcerative colitis and determined that it was a severe impairment that would impose restrictions on his activity. (AR 57-58.) Plaintiff had been dealing with this condition for at least a decade and it had been treated and controlled with Chloroquine medications. (*Id.*) The condition was chronic and had waxed and waned, but Plaintiff had learned to live with it. (AR 62.) The ulcerative colitis was likely the cause of his incontinence of stool, and

---

[1] Exhibits F10 and F11 had not yet been entered into the record at the time Dr. Morse testified. (AR 39-40.)

[2] The diabetes had been complicated by his obesity. (AR 58.)

11

there was no mention specifically of urinary incontinence in the record.[3] (AR 61-62.) Dr. Morse indicated that the record showed that Plaintiff's ulcerative colitis was in remission, and Plaintiff's medical records did not demonstrate the requirements of the ulcerative colitis listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*See* AR 58.)

Next, Dr. Morse considered Plaintiff's IBS, GERD, hypogonadism, and diabetes. (AR 58.) He opined that the IBS was explained by his ulcerative colitis and was not a separate issue. (*Id.*) Both the GERD and hypogonadism were being treated and were non-severe. (*Id.*) Plaintiff's diabetes, however, was a major medical issue and was further complicated by his obesity but was not subject to additional complications. (*Id.*)

Finally, Dr. Morse considered Plaintiff's multi-level degenerative disc disease. (AR 58-59.) He opined that evidence from the medical records supported this impairment, as there were X-rays and MRIs that confirmed the condition. (*Id.*) The condition created sciatic symptoms and sensory deficiencies, which explained Plaintiff's recorded pain in his back and lower extremities. (*Id.*) The pain in Plaintiff's feet could be caused by either his disc disease or his diabetes, but the medical records were not clear as to which. (AR 60-61.) Dr. Morse opined that Plaintiff was not a candidate for surgery to fix this issue and that the degenerative disc disease was a severe impairment that would have contributed to his limitations. (AR 59.)

Based on these conditions, Dr. Morse opined that Plaintiff could perform the following activities: (1) lift ten pounds on a frequent basis; (2) lift twenty pounds

---

[3] Dr. Morse noted that if there were urinary incontinence it would have been specifically noted in the medical record because it is a different medical condition than incontinence of stool. (AR 62.)

occasionally; (3) stand or walk for six hours out of an eight-hour day; (4) sit six hours out of an eight-hour day with normal breaks; (5) occasionally traverse ramps and stairs; and (6) engage in limited stooping, kneeling, crouching, and crawling. (*Id.*) Plaintiff would also be restricted from engaging in the following activities: (1) climbing ladders, ropes or scaffolds and (2) being exposed to hazardous machinery and unprotected heights. (*Id.*) Plaintiff's main limitation, according to Dr. Morse, was his back pain. (*Id.*) However, Dr. Morse was skeptical as to whether the ulcerative colitis, which was in remission, added any additional limitations that did not already exist because of Plaintiff's back pain. (*Id.*)

**E. The ALJ's Findings[4]**

The ALJ's written statement of decision proceeded through the five-step disability determination process and ultimately concluded that, though Plaintiff suffered from severe ulcerative colitis, IBS, GERD, diabetes mellitus, degenerative disc disease, and obesity, he was not totally disabled and could perform past relevant work as a sorter pricer. (AR 31-32.) As relevant to the parties' pending summary judgment motions, the ALJ made the following findings on Plaintiff's medically-determinable impairments and evaluated the severity of Plaintiff's obesity impairment:

> **3.      The claimant has the following severe impairment: ulcerative colitis, irritable bowel syndrome (IBS), gastroesophageal reflux disease (GERD), diabetes mellitus, degenerative disc disease and obesity (20 CFR 404.1520(c) and 416.920(c)).**
>
> The undersigned considers the above-listed impairments severe because they are more than slight abnormalities and they have more than a minimal effect on the claimant's ability to do basic physical or mental work activities, as discussed in more detail below at Finding 5.

---

[4] The ALJ's findings have been taken verbatim from the record. Formatting, quotes, and emphasis appear as they do in the Record, as do any spelling and other errors.

In addition to the above-listed severe impairments, there is objective evidence in the medical record that the claimant has been evaluated and treated for hypothyroidism and hypogonadism. However, these conditions are being managed medically, and should be amendable to proper control by adherence to recommended medical management and medication compliance (Exhibits 4F, pp. 24, 26; 7F, p.19; 8F, pp. 37, 48, 54, 67). Furthermore, no aggressive treatment was recommended or anticipated for these conditions. Similarly, the claimant has undergone bilateral carpal tunnel release but the medical records contain indication of related pain complaints or treatment for this condition since the alleged onset date (Exhibits 3F, p. 12; 8F, p. 5; 9F, p. 1). At the hearing, the medical expert testified that the claimant's hypothyroidism and [hypogonadism] were nonsevere and further testified that the claimant experienced no limitations as the result of his history of carpal tunnel release. Accordingly, these impairments are nonsevere because they are only slight abnormalities and they do not have more than a minimal effect on the claimant's ability to do basic physical or mental work activities.

In determining the claimant's residual functional capacity, the undersigned considered the functional limitations resulting from all of the claimant's medically determinable impairments, including these nonsevere impairments (20 CFR 404.1545 and 416.945). However, the evidence does not support a finding of any functional limitation other than those included in Finding 5.

. . . .

**5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as a defined in 20 CFR 404.1567(b) and 416.967(b) with the following exceptions: the claimant is able to occasionally climb ramps and stairs but may never climb ladders, ropes and scaffolds; is able to occasionally balance, stoop, kneel, crouch, and crawl; and must also avoid even moderate exposure to hazardous machinery and unprotected heights.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as

14

consistent with the objective medical evidence . . . . The undersigned has also considered opinion evidence . . . .

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

The claimant testified at the hearing that he stopped working in 2012 because his mother passed away and he moved in with his sister. He alleges that he has been diagnosed with ulcerative colitis that results in his having to go to the bathroom constantly, as well as cramping, rectal bleeding, diarrhea and incontinence; he testified that he was hospitalized one year ago and is now receiving antibiotics and infusion to hold this condition in remission. The claimant additionally stated that he has had irritable bowel syndrome since the late 1990s but that this condition has gotten worse. He further testified that he experiences back pain that radiates down his legs and he uses a cane due to problems with balance and falling down. He admitted that his pain is helped by medication that makes him sleepy but denied that physical therapy was effective. The claimant also testified that he has foot pain from diabetes and from a clubfoot condition as a child. He states that he drives but does no chores, can walk one block, can sit one half hour, can stand five to ten minutes but must move around, and is able to lift one gallon of water. He testified that he has difficulty putting on socks and pants and

taking a shower, and must lay down for half of the day. Finally, he testified that he has sleep apnea and uses a CPAP machine at night.

The claimant's statements of record, including those in several disability reports and a function report, are essentially consistent with his testimony (Exhibits 2E-3E, 5E-6E, 8E-10E, 12E-13E). He additionally states that he plays games on the computer and watches television, runs errands with his sister, cleans his room, talks to friends on the computer, visits and goes to church with his family and is able to prepare simple meals (Exhibit E5, pp. 6-7, 9). Finally, he states that he also has been diagnosed with gastroesophageal reflux disease (GERD) (Exhibit 8E, p.2). The claimant's sister filed a third party function report that is consistent with the claimant's statements of record and also states that he works on model trains in the garage with the family (Exhibit 6E, p. 4).

In order to view the record in the light most favorable to the claimant, the undersigned has read and considered all of the submitted medical evidence (Exhibit 1F-11F). The medical evidence reflects that the claimant has had ulcerative colitis for many years and experiences periodic flares that require medication; he reported that he usually has two flares per year but claimed they increased in 2013 (2F, pp. 4, 9; 3F, p. 15; 5F,p. 9; 10F, p.1). He was briefly hospitalized with a flare in late 2012, but this incident responded well to medication and his colitis was under control by May 2013 (Exhibits 3F; 4F, p. 24; 7F, pp. 13, 18). Two documented flares in 2013 were also resolved by medication, as was one documented flare in 2014 (Exhibits 8F, pp. 48, 62; 10F, pp. 5, 9). Before and after these incidents, the claimant had reported better bowel movements and less pain (Exhibit 8F, pp. 4, 22, 62). Further, his colitis was noted as being in remission as of June 2014 (Exhibit 8F, pp.6, 11, 13). The claimant has additionally been diagnosed with irritable bowel syndrome, but his gastroenterologist noted that this condition may be part of his ulcerative colitis (Exhibit 10F, p. 4). He was also diagnosed with gastroesophageal reflux disease (GERD), but this appears to be controlled with medication; the medical records indicate no current treatment other than medication and no complaints by the claimant associated with this condition (Exhibit 8F, p. 64).

16

The claimant is also taking medication for diabetes mellitus, which appears to be effective in controlling his blood sugar (Exhibits 3F, p. 4; 4F, p. 2; 7F, pp. 12-13). The condition was noted as poorly controlled at the beginning of 2014, but the claimant's physician also noted that he had been off his diet and that his diabetes was improving overall (Exhibit 8F, pp. 29, 31). His physician further noted that the steroids the claimant was taking for his ulcerative colitis had a negative effect on his blood sugar (Exhibit 10F, p. 11). He was seen by a podiatrist for ankle edema related to his diabetes and received a shoe prescription, though he reported no foot pain at the time (Exhibit 11F, pp. 1-2).

Additionally, an MRI scan of the claimant's lumbar spine in 2011 showed L3-4 central canal stenosis and left L4-5 disc protrusion, and he received an epidural injection for associated pain (Exhibits 1F; 9F, p. 2). More recent diagnostic imaging shows mild degenerative disc disease at L3-4 but no acute abnormality (Exhibit 7F, p. 44). While physical examinations have shown periodic lumbar tenderness, with radiating pain down the claimant's leg, he has reported that both physical therapy and his pain medication are effective (Exhibits 4F, p. 9; 7F, pp. 7, 33; 8F, p. 41; 9F, p. 1). Finally, the claimant's severe obesity is documented throughout the medical records, which list his height as five feet, nine inches and weight as 267 pounds (Exhibit 8F, p. 63). His body mass index (BMI) is thus 39.4 and the undersigned accordingly considered his weight, including its impact on [his] ability to ambulate and on his other body systems, within the residual functional capacity stated above.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limited effects of these symptoms are not entirely credible for the reasons explained in this decision. In particular, the credibility of the claimant's allegations regarding the severity of his symptoms and limitations is diminished because those allegations are greater than expected in light of the objective evidence of record. The claimant admits that he stopped working for non-medical reasons and indicated that he looked for work when he first moved to California to live with his sister, but was simply not offered a job. Moreover, the claimant admitted that his ulcerative

colitis is in remission, which is also documented in the medical evidence; while he has periodic flares, this condition appears to respond well to medication. While he also testified that his IBS has gotten worse, the medical evidence contains no corresponding increase in complaints or treatment for this condition. Moreover, despite testifying that physical therapy was not helping his back pain, he reported to his treating physician in July 2014 that it was moderately effective.

In determining the residual functional capacity, the undersigned has weighed all medical opinions of record. [Significant] weight is given to medical expert John Morse, M.D., who reviewed the medical evidence of record and testified at the hearing that the claimant's ulcerative colitis was controlled or in partial remission based on medication and his diet, but concluded nonetheless that this condition was severe enough to create some limitations. He additionally noted that the claimant would experience limitations from his degenerative disc disease. The limitations assessed by Dr. Morse are consistent with those determined herein and are supported by the medical record as a whole. Similarly, great weight is given to the State agency medical consultant at reconsideration, who assessed similar limitations (Exhibits 5A, pp 8-9; 6A, pp. 8-9). Less weight is given to the State agency consultant at initial review, who assessed consistent exertional limitations but did not [include] postural limitations to account for the claimant's severe impairments (Exhibits 1A, pp. 6-7; 2A, pp. 6-7). However, this assessment was made in December 2012, and thus this consultant was not able to review the subsequently submitted evidence.

The undersigned gives little weight to the third-party function reported completed by Allyn Richards, the claimant's sister (Exhibit 6E). In determining the claimant's residual functional capacity, the undersigned considered the diagnoses, symptoms, and functional limitations Ms. Richards reported. However, her statements essentially mirror the claimant's testimony and statements of record which, as discussed above, the undersigned finds less than fully credible. The undersigned further discounts the credibility of Ms. Richards' statements because, to the extent her statements suggest the claimant cannot work at the level of substantial gainful activity, they are not consistent with the objective medical evidence discussed above, which

demonstrates that the claimant is capable of work at the level determined herein.

In sum, the above residual functional capacity assessment is supported by the evidence as a whole. As discussed above, the claimant's subjective complaints are less than fully credible and the objective medical evidence does not support the degree of her alleged symptom severity and functional limitations. In addition, no treating or examining medical source endorsed the degree of limitation alleged by the claimant or assessed more restrictive functional limitations than those determined in this decision. Thus, the residual functional capacity determined in this decision reflects the claimant's partially credible subjective complaints while finding the maximum limitations based on the clinical and objective evidence.

**6. The claimant is capable of performing past relevant work as a sorter pricer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).**

Based on the claimant's documented vocational background, testimony, and earnings record, and on the vocational expert's testimony, the undersigned finds the claimant worked in the occupation listed below within 15 years of the date of this decision, for a sufficient length of time to learn and provide average performance, and at the level of substantial gainful activity:

1. Sorter pricer, DOT 222.387-054, a light, skilled (SVP 5) occupation as generally performed pursuant to the DOT, but actually performed as medium work as described by the claimant.

There are no discrepancies between the vocational testimony and the information contained in the DOT, and the undersigned accepts her testimony in accordance with SSR 00-4P.

In comparing the claimant's residual functional capacity with the physical and mental demands of his past relevant work, the undersigned has determined the claimant is able to perform this past relevant work

19

as it is generally performed. The description of the exertional requirements of this job in the DOT is consistent with the residual functional capacity determined herein.

**7. The claimant has not been under a disability, as defined in the Social Security Act, from June 15, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

## DECISION

Based on the application for a period of disability and disability insurance benefits protectively filed on August 15, 2012, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income protectively filed on August 15, 2012, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(AR 25-32.)

## III. DISCUSSION

### A. The ALJ Did Not Err; Plaintiff is Not Entitled to Summary Judgment

In his MSJ, Plaintiff states two bases for his claim that the ALJ erred in his disability determination. First, he contends the ALJ lacked substantial evidence to support his RFC assessment. Second, he contends the ALJ erred by finding that Plaintiff's subjective testimony was not credible. Both of these claims, and the relevant legal standards for each, are discussed below in this section followed by an overall conclusion.

#### 1. The ALJ's RFC Assessment Was Based on Substantial Evidence

##### a. Legal Standard

Claimants are responsible for providing all evidence used to determine the RFC. 20 C.F.R. § 404.1512(a). Correspondingly, the ALJ has the responsibility of

developing a complete medical history and making a reasonable effort to help obtain medical records before asking for a consultative examination by a state agency medical consultant. *See id.* §§ 404.1512(a), 416.912(d)-(f).[5] The "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011). "'The district court may set aside a denial of benefits only if it is not supported by substantial evidence or if it is based on legal error.'" *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)); *see also* 42 U.S.C. § 405(g). Substantial evidence "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009) (quoting *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)).

The ALJ will evaluate all medical opinions it receives in determining the claimant's RFC. 20 C.F.R. § 404.1527(c). A medical opinion is "a statement from a medical source about what [claimants] can still do despite [their] impairments." *Id.* § 404.1527(a)(1). Generally, the ALJ gives more weight to opinions from treating sources. *Id.* § 404.1527(c)(1), (c)(2). If the treating source's opinion is well supported "by medically acceptable clinical and laboratory diagnostic techniques" and is not inconsistent with other evidence in the record, then the ALJ can give it controlling weight. *Id.* § 404.1527(c)(2). In cases where a treating source was not given controlling weight, non-treating, non-examining physicians may provide substantial evidence to support the ALJ's findings. *Thomas*, 278 F.3d at 957. In determining how much weight to give medical opinions of non-treating

---

[5] 20 C.F.R. § 416.912 has been reformatted since the ALJ's ruling and the current corresponding sections are 20 C.F.R. § 416.912 (b)(1), (b)(2).

physicians, the ALJ considers: (1) the extent of the medical examination; (2) how much the opinion is supported and explained by evidence in the record; (3) how consistent the medical opinion is with the record as a whole; (4) whether the opinion comes from a specialist; and (5) other factors that support or contradict the medical opinion. *See* 20 C.F.R. § 404.1527 (c)(1)-(6). The ALJ must incorporate evidence from prior state agency medical consultants as appropriate and give weight according to the standards stated above. *Id.* § 404.1513a(b)(1).[6]

In establishing a claimant's RFC, the ALJ must assess all relevant medical and non-medical evidence in addition to considering all of the claimant's impairments, including impairments categorized as non-severe. 20 C.F.R. § 404.1545(a)(3), (e). While non-severe impairments alone may not limit an individual's ability to work significantly, when considered with other limitations, they may be critical to the outcome of a claim. SSR 96-8p. An omission of a non-severe impairment will not reverse the ALJ's RFC assessment if the error was harmless, *i.e.*, the error is irrelevant to the ultimate disability conclusion. *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (discussing when ALJ's error is harmless); *see also Hurter v. Astrue*, 465 Fed. Appx. 648, 652-53 (9th Cir. 2012) (holding that failure to include non-severe impairment with merger evidentiary support in RFC evaluation was harmless error) (unpublished).

### b. Analysis

Because the Court can only set aside an ALJ's denial of benefits if the ruling lacks substantial evidence or is based on legal error, the Court's task is to determine whether substantial evidence supports the ALJ's RFC findings. In doing so, the Court keeps in mind that (1) "[s]ubstantial evidence means more than a scintilla but

---

[6] State agency medical consultants are considered to be "highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 404.1513a(b)(1)

less than a preponderance;" (2) "substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion;" and (3) "where evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas*, 278 F.3d at 954 (internal quotations and citations omitted). With this framework in mind, the ALJ's RFC findings did not lack substantial evidence.

### i. The ALJ Assigned Proper Weight to the Medical Source Evidence

As an initial matter, the ALJ relied on four sources of testimonial evidence in addition to Plaintiff's medical record to support the RFC findings. He gave *significant weight* to the testimony of medical expert Dr. Morse; *great weight* to the state agency medical consultant, Dr. Mazuryk, who examined Plaintiff before his reconsideration hearing; *less weight* to the initial state agency medical consultant, Dr. Laiken; and *little weight* to the testimony of Plaintiff's sister, Allyn Richards.[7] (AR 31.) Because there was no opinion from a treating source in the record, such a source was not given controlling weight. Therefore, Dr. Morse's medical opinion, as non-treating, non-examining, can serve as substantial evidence to support the

---

[7] Richards's report was given only little weight because it essentially mirrored Plaintiff's testimony which was determined not to be credible. (AR 31.) The ALJ's decision here was not erroneous. The ALJ found this report "essentially mirror[ed]" the claimant's testimony and found it was not credible for the same reasons as Plaintiff's testimony. Plaintiff's credibility will be discussed in the following subsection.

ALJ's findings.[8] Thus, the ALJ met his burden by showing that substantial evidence supported his RFC findings.

Regarding any potential error in the weight given to each source, the ALJ appropriately weighed each opinion in determining the RFC according to the standards described above.[9] While Dr. Morse was a non-treating, non-examining source, the ALJ did not err in giving his testimony significant weight. First, Dr. Morse supported his opinions with evidence from the record. In the ALJ's hearing, Dr. Morse testified that he reviewed Plaintiff's medical records, Exhibits 1-F through 9-F, and based his conclusions on these documents. (AR 57.) In determining the effect of both Plaintiff's severe and non-severe impairments, Dr. Morse cited the record on multiple occasions, referring to medical procedures, treatments, symptoms, and progress reports in his evaluation. (AR 57-62.) Second, Dr. Morse's testimony appears consistent with the record as a whole, and Plaintiff has not presented evidence that Dr. Morse's opinions were inconsistent with the record as a whole. Third, Dr. Morse is a board-certified internist and cardiovascular specialist who has served as a medical expert for disability adjudication since 2003.

---

[8] Dr. Morse opined: "I would think he could lift 10 pounds on a frequent basis, 20 pounds occasionally. He would be limited to standing and walking for six hours out of an eight-hour day and sitting for six hours out of [an] eight-hour day with normal breaks. His posturals would be limited to only occasional ramps and stairs. He would avoid ladders, ropes or scaffolds altogether. Balancing, stooping, kneeling, crouching and crawling are limited to occasional . . . . His posturals, certainly, would avoid exposure to hazardous machinery and unprotected heights, and I'd limit that to even moderate." (AR 59-60.)

[9] Again, the five factors used to weigh medical opinions are (1) the extent of the medical examination, (2) how much the opinion is supported and explained by evidence in the record, (3) how consistent the medical opinion is with the record as a whole, (4) whether the opinion comes from a specialist, and (5) other factors that support or contradict the medical opinion. *See* 20 C.F.R. § 404.1527 (c)(1)-(6).

(AR 150-53.) Given these facts, it was appropriate for the ALJ to assign significant weight to Dr. Morse's medical opinion.

The ALJ appropriately gave great weight to Dr. Mazuryk's opinion and less weight to Dr. Laiken's opinion, both of whom provided opinions similar to Dr. Morse's. Federal and state agency medical consultants are considered highly qualified experts in Social Security disability evaluations. 20 C.F.R. § 404.1513a(b)(1). Additionally, although both these physicians, unlike Dr. Morse, had an opportunity to examine Plaintiff, they did not have an opportunity to examine Plaintiff's full medical record, which Dr. Morse had done. (*See* AR 70-74, 91-97.) Therefore, the ALJ did not err in assigning their testimonies greater and lesser weights, respectively. The fact that their opinions are consistent with Dr. Morse's opinions lends further support to the conclusion that the ALJ's RFC findings were based on substantial evidence. (*See* AR 72-73, 94.)

### ii. The ALJ Did Not Err in Developing the Record

Plaintiff also argues that the ALJ's failure to develop the record constitutes error. (ECF No. 15 at 5-6.) He contends the ALJ should have acquired a medical opinion from a treating source before making his RFC determination. *Id.* While it is true that the ALJ has a responsibility to develop the record, Plaintiff has the initial burden of providing the evidence necessary for the evaluation. 20 C.F.R. § 404.1512(a), (b). After that initial burden is satisfied, the ALJ only has to develop the record in cases where the evidence is either ambiguous or inadequate to evaluate Plaintiff's RFC. *See McLeod*, 634 F.3d at 520. Here, the medical record is extensive, consisting of roughly fifty doctors' visits and medical examinations spanning over a decade. Similarly, the record is detailed and unambiguous about the extent of Plaintiff's medical conditions. Thus, the ALJ did not have a duty to develop it further.

Even if the ALJ had a duty to develop the record further to obtain medical opinions from treating sources, he only had a duty to use reasonable efforts to do so. 20 C.F.R. § 404.1512(b)(1). The record demonstrates that, in multiple instances, the ALJ satisfied this requirement by requesting further medical documentation from treating sources. (AR 333-34, 352-56, 380-81, 392-93, 409-10.) The lack of opinions from treating sources and the ALJ's subsequent reliance on medical experts does not constitute error.

Plaintiff contends *Orn v. Astrue*, 495 F.3d 625 (9th Cir. 2007), requires that the medical records alone should be treated as mere communications between health care providers rather than evidence for disability determination purposes. (ECF No. 15 at 5-6.) Plaintiff argues, thus, that the medical records alone are inadequate and require further development. (*Id.*) This argument mistakes the holding of *Orn*. While it is true that the Ninth Circuit has held that "[t]he primary function of medical records is to promote communication and record-keeping for health care personnel -- not to provide evidence for disability determinations," the court did not hold that medical records are not but only that a medical condition need not be present on every report so long as the record as a whole provides evidence of the condition. *Orn*, 495 F.3d at 634. Here, all of the impairments used to evaluate Plaintiff's RFC, while not mentioned on every report, are well-documented in the record as a whole.

### iii. The ALJ's RFC Assessment Was Based on Substantial Evidence

Plaintiff next alleges that the ALJ's RFC assessment was not based on substantial evidence because the medical experts failed to properly consider all of his impairments—specifically, the impact of his obesity, edema in his extremities,

and severity of his pain.[10]  (ECF No. 15 at 6-7.)  He contends that because the ALJ must consider all of the claimant's impairments, including impairments categorized as non-severe, the ALJ's failure to do so here was in error.  *See* 20 C.F.R. § 404.1545(a)(3), (e).  Although there is some evidence to suggest that the ALJ failed to consider the full extent of Plaintiff's impairments, none amount to error that would require a reversal of the ALJ's findings.

First, Dr. Morse's testimony, which the ALJ accorded significant weight, relied on Exhibits F1-F9, but Exhibits F10-F11 had not yet been submitted to the record at the time of his testimony.  (AR 39-40.)  Therefore, Dr. Morse's testimony relied on an incomplete medical record, which is the reason the ALJ cited for according Dr. Laiken's testimony less authoritative weight.  (AR 31.)  Plaintiff argues that, by the same rational, the ALJ, erred in giving Dr. Morse's opinion significant weight.  However, the fact that Exhibits F10-F11 were not included in Dr. Morse's testimony at most constitutes harmless error because they would have had no impact on Plaintiff's disability determination.  Exhibits F10-F11 cover the same time period as—and do not contradict or add anything not already stated in—Exhibits F1-F9.  (*See* AR 536-43, 544-61, 562-64.)  Additionally, while the ALJ accorded significant weight to Dr. Morse's testimony, the ALJ's ultimate determination was based on a complete evaluation of the record, including Exhibits F10-F11.  (AR 27.)

Second, Dr. Morse's testimony failed to discuss Plaintiff's obesity or edema in his testimony.  While Dr. Morse mentioned Plaintiff's obesity in the context of diabetic complications, he did not evaluate its impact independently as he did all

---

[10] The severity of pain issue will be discussed in the following section as it concerns the credibility of Plaintiff's subjective testimony.

other impairments.  (*See* AR 57-62, 58.)  Plaintiff is correct in stating, according to Social Security Ruling 02-1P:

> An assessment should also be made of the effect of the obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time . . . RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.

Social Security Ruling 02-1p.

Similarly, Dr. Morse briefly discussed the pain in Plaintiff's feet but did not independently evaluate the impact of the edema on Plaintiff's ability to function, as he did the other impairments.  (*See* AR 57-62, 61.)

The foregoing notwithstanding, however, an RFC finding need not *explicitly* consider all impairments so long as all symptoms are considered in formulating the RFC.  *Hurter v. Astrue*, 465 Fed. Appx. 648, 652-53 (9th Cir. 2012) (unpublished); *see also McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011) (holding ALJ did not err for failing to make explicit certain non-exertional limitations in RFC); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (holding ALJ did not err for failing to explicitly consider claimant's obesity); *Ortiz v. Sec'y of Health and Human Servs.*, 890 F.3d 520, 525 (1st Cir. 1989) (holding ALJ did not err by implicitly referencing two of claimant's impairments).  Here both the edema and obesity were well-documented in the record, and the fact that Dr. Morse references them in his testimony means that he was aware of the symptoms.  Dr. Morse also testified that he "had an opportunity to review the evidence of the record," and his assessment of functional capability "consider[ed] all these conditions and the obesity."  (AR 57,

28

59.) Therefore, the fact that Dr. Morse did not explicitly consider these impairments does not affect the ALJ's reliance on his testimony.  465 Fed. Appx. at 652-53.

### iv. Any Error in the ALJ's RFC Assessment was Harmless

Even if the Court finds the ALJ erred, any error due to Dr. Morse not explicitly evaluating obesity and edema was harmless.  Dr. Morse was asked directly to consider the effect of Plaintiff's obesity in his RFC recommendation.  (AR 59.)  Therefore, even though Dr. Morse failed to address the obesity explicitly, he was directed to include it in his assessment.  Thus, any error caused by not being explicit about the effects of the Plaintiff's obesity and edema would not have impacted the disability conclusion.

As to the edema in Plaintiff's extremities, the medical records show that the impairment is only periodic rather than chronic.  The symptom appears only five times throughout the entire medical record, while all other impairments appear nearly continuously throughout each medical report.  (AR 336, 414, 546, 549, 563.)  Thus, it may be reasoned that such an infrequent impairment would not affect the ultimate disability conclusion.  Additionally, Dr. Morse was asked to consider all conditions in his assessment, and because the edema was included in the medical records he was asked to review, it is logical that Dr. Morse included edema in his overall assessment of Plaintiff's functional capacity.  (AR 59.)

Further, an error is harmless if it does not impact the ALJ's ultimate disability conclusion.  *Stout*, 454 F.3d at 1055.  Here, any error was harmless because it is highly doubtful that it would have impacted the ALJ's disability conclusion.  Even if Dr. Morse's testimony did not expressly identify obesity and edema, it does not follow that the ALJ's ultimate disability conclusion would have differed.  While the ALJ accorded significant weight to Dr. Morse's opinion, he did not give it

29

controlling weight, but instead also gave weight to the opinions of Dr. Mazuryk and Dr. Laiken. (AR 31.) Their opinions concur with Dr. Morse's opinions on Plaintiff's RFC, and there is no evidence that there was an error in their opinions. And importantly, both the edema and obesity are explicitly discussed in the ALJ's ruling. (AR 30.) Thus, the record as a whole demonstrates that even if there were an error in Dr. Morse's testimony, it would not have impacted the ALJ's disability conclusion, which did expressly include these impairments in its assessment

### 2. The ALJ Did Not Err in Rejecting Plaintiff's Subjective Testimony

Because, at step one, the ALJ found that Plaintiff had the medically-determinable severe impairments[11] and made no findings of malingering, the Court's task is to determine whether the ALJ's partial adverse credibility finding, with respect to the alleged severity of Plaintiff's symptoms, is supported by substantial evidence under the clear-and-convincing standard. In doing so, the Court considers the basic analytical framework that (1) Plaintiff bears the burden of showing that he suffers from any medically-determinable physical or mental impairment; (2) such impairment must find support in the medical documentation; and (3) Plaintiff's unsupported statement of symptoms are an insufficient basis for disability determination in his favor. 42 U.S.C. § 423(d)(3), (d)(5)(A); *Batson v. Comm'r*, 359 F.3d 1190, 1193-94 (9th Cir. 2004). Given this framework, the ALJ did not err in discounting Plaintiff's testimony, and he provided specific, clear, and convincing reasons why Plaintiff's testimony about the extent of his symptoms was not credible. And although, as explained below, the ALJ cited some erroneous reasons, his citation to other valid reasons satisfied his duty to cite clear and convincing reasons that found support in the record.

---

[11] Ulcerative colitis, IBS, GERD, diabetes mellitus, degenerative disc disease, and obesity.

### a. Legal Standard: Credibility Determinations

The ALJ is not "required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). To permit meaningful judicial review of the credibility determination, the ALJ must "specify which testimony [he] finds not credible, and then provide clear and convincing reasons supported by evidence in the record to support that credibility determination." *Brown-Hunter v. Colvin*, 806 F.3d 487, 488-89 (9th Cir. 2015).

"In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis." *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). The ALJ must initially determine whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.*

> When an [ALJ] determines that a claimant for Social Security benefits is not malingering and has provided objective medical evidence of an underlying impairment which might reasonably produce the pain or other symptoms [he or] she alleges, the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so.

*Brown-Hunter*, 806 F.3d at 488-89. The ALJ may consider the factors listed in Social Security Ruling 88-13, which include:

> 1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain; 2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions); 3. Type, dosage, effectiveness, and adverse side-effects of any pain medication; 4. Treatment, other than medication, for relief of pain; 5. Functional restrictions; and 6. The claimant's daily activities.

*Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005).

31

Furthermore, even if one or more reasons listed by the ALJ are invalid, so long as the ALJ provides some valid reasons, the ALJ's credibility determination will be upheld. *Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1162 (9th Cir. 2008) (stating that an ALJ's citation to erroneous reasons is harmless so long as the "ALJ's remaining reasoning and ultimate credibility determination were adequately supported by substantial evidence in the record[]").

### b. Analysis

As an initial matter, the ALJ found that the ulcerative colitis, IBS, GERD, diabetes mellitus, degenerative disc disease, and obesity were medically-determinable severe impairments that the medical evidence supported. (AR 27-28.) These findings found support in the medical documentation, which reflected medical professionals' concerns about Plaintiff's conditions and ongoing treatments to manage the symptoms of each. Thus, with respect to these impairments, Plaintiff met his burden to show that he qualified for severe ailments, and the Record supports the ALJ's finding.

Having found that Plaintiff qualified for the above stated impairments, the ALJ then considered the credibility of Plaintiff's testimony about the severity of the impairments and their impact on his ability to perform any type of work. At that step, the ALJ properly doubted Plaintiff's credibility about the severity of his ulcerative colitis and degenerative disc disease symptoms and their resulting life-limiting consequences.

The ALJ did not find that Plaintiff completely lacked credibility as a witness, but rather found that the degree or intensity of his credible symptoms were inconsistent with the rest of his testimony and the Record. (AR 30.) The ALJ reached this conclusion based upon: (1) the lack of objective medical evidence or medical opinions that supported the severity of his testimony; (2) evidence that

Plaintiff's symptoms were improving; (3) evidence that Plaintiff's testimony contradicted medical opinions, in addition to no treating medical source that endorsed a more restrictive RFC; and (4) evidence that Plaintiff stopped working for non-medical reasons. (AR 30-31.) In providing these factors for his decision, the ALJ cited specific, clear, and convincing reasons for partially discounting Plaintiff's credibility and testimony, and his consideration of these factors was proper.

### i. The Record Supports the ALJ's Credibility Finding Due to the Lack of Objective Medical Documentation to Support Plaintiff's Ulcerative Colitis Severity Testimony

The Record supports the ALJ's finding that Plaintiff's impairments reasonably caused his limitations but not to a disabling degree because the objective medical documentation did not reflect the severity of Plaintiff's self-reported symptoms. As the ALJ explained, the medical evidence showed that Plaintiff grossly overstated the effects of his ulcerative colitis and IBS, which he claimed had worsened since 2012 despite the fact that the record shows that his ulcerative colitis is in remission. (AR 54, 460.) He further claimed that these conditions caused him bowel movements of at least two an hour on good days, which is inconsistent with the medical record which shows that as of April 13, 2014, Plaintiff had been having only between four and eight bowel movements per day. (AR 48, 552.) The ALJ, thus, gave clear and specific reasons for discounting the severity of Plaintiff's ulcerative colitis testimony and tied those reasons to the medical evidence before him. Doing so was within the ALJ's authority and in compliance with the law in this Circuit. *Morgan v. Comm'r*, 169 F.3d 595, 600 (9th Cir. 1999) ("Citing the conflict between Morgan's testimony of subjective complaints and the objective medical evidence in the record, and noting the ALJ's personal

33

observations, the ALJ provided specific and substantial reasons that undermined Morgan's credibility.")

### ii. The Record Does Not Support the ALJ's Credibility Findings on Plaintiff's Back Pain Severity Testimony

The ALJ also found that the record showed Plaintiff had "mild degenerative disc disease at L3-4 but with no acute abnormality . . . examinations [showing] periodic lumbar tenderness, with radiating pain down the claimant's leg . . . ." (AR 30.) Plaintiff testified that the severity of this pain had caused episodes of incapacitation occurring on multiple occasions. (AR 43-44.) While the ALJ acknowledged the records' notations regarding Plaintiff's back pain, he partially discredited Plaintiff's testimony about the severity of the back pain. (AR 30.) The ALJ determined that Plaintiff's testimony about the degree of pain caused by the degenerative disc disease was contradicted by the objective medical reports, which showed the pain was being treated by physical therapy and medication. (*Id.*)

The record, however, provides mixed reports on the extent to which Plaintiff's back pain was sufficiently managed by physical therapy and medication. In at least five instances in the record, the medical reports show Plaintiff fell during medical examinations, and on July 12, 2013, Plaintiff was given instructions "not to stand for long periods of time." (AR 460, 467, 497, 518, 525.) Additionally, while Plaintiff was managing his back pain with Norco, the dosage was increased on June 16, 2014. (AR 466.) While it is also true that the July 2014 physical therapy report showed moderate improvements with his lower back, an earlier report in January 2014 is consistent with Plaintiff's testimony where he claimed the therapy "didn't work." (AR 44, 485, 536.) This evidence suggests that Plaintiff continues to suffer from severe symptoms despite treatment.

Upon considering the totality of the records, which contained numerous reports of the degree of the severity of Plaintiff's back pain, there is in sufficient evidence to show Plaintiff's testimony is inconsistent with the record or is unsupported by objective medical testimony.[12]

### iii. The Record Supports the ALJ's Credibility Finding Based on Plaintiff's Improving Symptoms

In addition to the objective medical evidence that undermined some of Plaintiff's testimony, the ALJ called into question Plaintiff's testimony based on evidence that his symptoms were improving. (AR 30-31.) The ALJ did not err here because he did not base his credibility determination *solely* on the lack of, or inconsistencies in the, objective medical evidence in the Record.[13]

The Record shows that *in addition to* the lack of medical evidence, the ALJ also expressly found that Plaintiff's improvements further informed his credibility determination:

---

[12] Plaintiff does not bear the burden of corroborating the severity of his pain with objective medical evidence but only has the burden of producing medical evidence of an underlying impairment that could reasonably produce the alleged pain. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 344) (9th Cir. 1991) (en banc)). Here the ALJ had already found that Plaintiff has produced evidence of an underlying impairment. A failure to provide objective medical evidence of the pain cannot be used as the *sole* basis for credibility determination. *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004) (assigning error where ALJ based its credibility determination *solely* on the lack of objective medical evidence).

[13] Though it is true that "[i]n evaluating the credibility of pain testimony after a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain," nonetheless "it is a factor that the ALJ can consider in his credibility analysis." *Burch*, 400 F.3d at 676, 680, 681; *cf. Moisa v. Barnhart*, 367 F.3d at 885.

Moreover, the claimant admitted that his ulcerative colitis is in remission, which is also documented in the medical evidence; while he has periodic flares, this condition appears to respond well to medication . . . . Moreover, despite testifying that physical therapy was not helping his back pain, he reported to his treating physician in July 2014 that it was moderately effective.

(AR 32-33.) The ALJ discounted Plaintiff's credibility because he found these improvements were inconsistent with Plaintiff's allegations of total disability.

Medication, treatments, or other methods of alleviating symptoms are factors taken into account when evaluating the credibility of Plaintiff's testimony as to the severity of his symptoms. 20 C.F.R § 404.1529(c)(3)(iv), (v). In particular, the new steroid treatment administered at UC San Diego Healthcare had placed his ulcerative colitis in remission. (AR 548.) This was a substantial improvement to a severe condition, the prior treatment of which had otherwise only managed the symptoms for over a decade. While, as discussed above, the medical record is less convincing as to the successful management of Plaintiff's back pain symptoms, the notes from the medical records in January 2014 when compared to the physical therapy report in July 2014 at least suggest moderate improvements and call into question Plaintiff's testimony that "it didn't work." (AR 44, 485, 536.) These improvements, combined with the other inconsistencies stated above, constitute specific reasons for discrediting Plaintiff's testimony. Thus, the ALJ's finding that Plaintiff's symptoms had improved was a permissible finding based on the Record.

### iv. The ALJ's Adverse Credibility Finding Based on the Lack of Treating Medical Source Opinion Was Not Erroneous

The ALJ also discredited Plaintiff's subjective testimony because there was no treating medical source to support his testimony of a more restrictive RFC. (AR 30-31.) The ALJ did not err in doing so.

36

Inconsistencies between medical opinions and a plaintiff's subjective testimony can serve as a valid basis for the ALJ to discredit a plaintiff's testimony. 20 C.F.R. § 404.1529(c)(1); *Carmickle*, 533 F.3d at 1161 (holding conflict between medical opinion and claimant's testimony is a valid credibility reason). However, where medical opinions are contradictory, inconsistencies between a plaintiff's testimony and that of only *some* of the medical opinions is not a valid justification for discrediting a plaintiff's testimony. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1147-48 (9th Cir. 2001).

Here, *all* of the opinions of the medical experts contradict Plaintiff's testimony that he is only able to perform sedentary work. (AR 31.) In particular, Plaintiff testified that he could only stand for ten minutes, sit for a half hour without stretching, and walk no more than a block, while the medical experts opined that he could stand, walk, or sit for six hours out of an eight hour day. (AR 46, 51, 59, 72-73, 94.) In light of these contradictions, the absence of a treating medical opinion that supports a more restrictive RFC is a specific reason backed by substantial evidence by which the ALJ can discredit Plaintiff's testimony.[14]

/ / /

/ / /

/ / /

/ / /

---

[14] In his motion, Plaintiff argues that the ALJ is responsible for developing the record further to obtain medical opinions from treating sources if that is a reason the ALJ gives to discredit Plaintiff's testimony. (MSJ ECF No. 15 6:1-4.) As discussed above, the medical record was adequate to allow the ALJ to make a determination, and thus the ALJ did not have a duty to develop it further. Likewise the ALJ had already used reasonable efforts without success to secure a treating physicians medical opinion. *See*, *supra*, Section III(A)(1)(b)(ii) ("The ALJ Did Not Err in Developing the Record").

### v. Plaintiff's Voluntary Work Stoppage Supports the ALJ's Adverse Credibility Finding, But the ALJ Failed to Develop the Record With Respect to Plaintiff's Ability to Find New Work

The ALJ additionally found that Plaintiff's voluntary work stoppage for non-medical reasons was another reason to discredit his testimony. (AR 30.) During the hearing, Plaintiff admitted that he voluntarily stopped working in order to move to California, but claimed that he would have stopped work anyway for medical reasons. (AR 40-41.) Prior relevant employment information, including reasons for unemployment, is a valid justification by which the ALJ can question the credibility of Plaintiff's testimony. *See* 20 C.F.R. § 404.1529(c)(3); *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (ALJ considered fact plaintiff was laid off in credibility determination); *Drouin v. Sullivan*, 966 F.2d 1255, 1258 (9th Cir. 1992) (ALJ considered fact plaintiff lost past two jobs for causes unrelated to pain in credibility determination).

However, Plaintiff claims that the ALJ had a duty to develop the record further to determine how his impairments have affected his ability to find new work. (ECF No. 15 at 10-11.) The ALJ has a "'duty to fully and fairly develop the record and to assure that the claimant's interest are considered,'" *Smolen*, 80 F.3d at 1288 (quoting *Brown*, 713 F.3d at 443), but the "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *McLeod*, 640 F. 3d at 885.

Here, the Record contains inadequate evidence about whether Plaintiff would have had to leave work for medical reasons had he not left due to his relocation and about how his impairments has affected his job search. Plaintiff testified that a California Goodwill location decline to hire him despite his work history because he "could never do the work," but the Record contains no other evidence regarding

38

his prior work performance. (AR 52.) Due to the need to develop the record further, the ALJ did not properly cite Plaintiff's unemployment for non-medical reasons as a reason to discount Plaintiff's credibility. Accordingly, this was not a clear and convincing reason supported by evidence that supports the ALJ's credibility finding.[15]

### c.     Conclusion

In sum, Plaintiff contends that once he produced medical evidence of an underlying medical condition, the ALJ "could not discredit the testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." (ECF No. 15 at 11-12.) However, as explained above, the ALJ did not discount the full breadth of Plaintiff's testimony based solely on the lack of objective medical evidence. The ALJ here articulated *additional* specific reasons for the credibility determination. (AR 30-31.) Those reasons were clear, convincing and find support from substantial evidence in the Record. While some of the reasons were invalid, so long as he provided some valid reasons, his credibility determination will be upheld. The substantial evidence standard is not particularly demanding, and the ALJ has satisfied it here. *See Thomas*, 278 F.3d 947, 954 (9th Cir. 2002) ("Substantial evidence means more than a scintilla but less

---

[15] Defendant also argues that in addition to stopping work for non-medical reasons, Plaintiff also was able to work at Goodwill with the same symptoms as he has now prior to claiming disability benefits. (ECF No. 16 at 8.) Plaintiff is correct in stating that the Court should not consider this additional rationale because it does not appear in the ALJ's original findings. "Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking." *Bray v. Comm'r, SSA*, 554 F.3d 1219, 1225 (9th Cir. 2009).

than a preponderance.")  Accordingly, his credibility finding was not erroneous. *Carmickle*, 533 F.3d at 1162-63.

Plaintiff has not shown that the ALJ's RFC determination was not based on substantial evidence.  Similarly, Plaintiff has also not shown that the ALJ erred in determining his subjective testimony was not credible.  For the foregoing reasons, the Court recommends that Plaintiff's MSJ be DENIED.

**B.     Defendant is Entitled to Summary Judgment**

In addition to Plaintiff's summary judgment motion, Defendant's cross-motion for summary judgment is pending before the Court.  Defendant contends that the ALJ's RFC was supported by substantial evidence and the ALJ's credibility determination was based on specific reasons based on substantial, clear and convincing evidence in the Record.

As discussed above, the ALJ supported his RFC determination with substantial evidence from three medical opinions, and the record amply supports the ALJ's findings.  With respect to Plaintiff's credibility and claims of greater disability, the ALJ did not specifically identify which portions of his testimony were credible, but rather discounted the credibility of all "statements concerning the intensity, persistence, and limiting effects of [Plaintiff's] symptoms."  As discussed above, the ALJ provided clear and convincing reasons for discounting these portions of the testimony.  Contrary to Plaintiff's argument, the ALJ properly evaluated, among other things, his treatment and examination records and the objective medical testimony.  The Court recommends that Defendant's Cross-MSJ be GRANTED.

/ / /

/ / /

/ / /

/ / /

40

# IV.  CONCLUSION

Based on the foregoing reasons, the ALJ did not err in evaluating Plaintiff's RFC.  Nor did the ALJ err in discounting Plaintiff's testimony.  Accordingly, this Court RECOMMENDS that Plaintiff's MSJ be DENIED and that Defendant's Cross-MSJ be GRANTED.  This Report and Recommendation is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C § 636(b)(1) and Federal Rule of Civil Procedure 72(b).

**IT IS ORDERED** that **no later than July 12, 2017**, any party to this action may file written objection with the Court and serve a copy on all parties.  The document shall be captioned "Objections to Report and Recommendation."  The parties are advised that failure to file objections within the specific time may waive the right to raise those objections on the appeal.

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the court and served on all parties **no later than July 19, 2017**.

**IT IS SO ORDERED.**

DATED:  June 28, 2017

Hon. William V. Gallo
United States Magistrate Judge

41